USDC SCAN INDEX SHEET

















AJG   11/4/04   8:15

3:04-CR-02254   USA V. LIVINGSTON

*19*

*CRRESPM.*



ORIGINAL

FILED

OCT 2 9 2004

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1  CAROL C. LAM
   United States Attorney
2  STEPHEN R. COOK
   Assistant U.S. Attorney
3  California State Bar No. 204446
   Federal Office Building
4  880 Front Street, Room 6293
   San Diego, CA 92101-8893
5  Telephone: (619) 557-6747

6  Attorneys for Plaintiff
   United States of America

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10 UNITED STATES OF AMERICA,          )    Criminal Case No. 04CR2254-WQH
                                      )
11                   Plaintiff,       )    Date:  November 5, 2004
                                      )    Time:  1:30 p.m.
12                                    )
                                      )
13            v.                      )    GOVERNMENT'S RESPONSE AND
                                      )    OPPOSITION TO DEFENDANT'S
14 LEON BURTON LIVINGSTON,            )    MOTION FOR SUPPRESSION OF
                                      )    EVIDENCE,
15                   Defendant.       )
                                      )    TOGETHER WITH THE ATTACHED
16                                    )    STATEMENT OF FACTS, MEMORANDUM
                                      )    OF POINTS AND AUTHORITIES, AND THE
17                                    )    GOVERNMENT'S MOTION FOR
                                      )    RECIPROCAL DISCOVERY.
18 _____)

19        COMES NOW the plaintiff, United States of America, by and through its counsel, Carol C. Lam,

20 United States Attorney, and Stephen R. Cook, Assistant United States Attorney, and hereby files its

21 Response and Opposition to Defendant's above-referenced motion. This Response and Opposition is

22 based upon the files and records of the case, together with the attached statement of facts and

23 memorandum of points and authorities.

24                                    I

25                         **STATEMENT OF THE CASE**

26        On August 24, 2004, a grand jury in the Southern District of California returned an indictment

27 charging Defendant Leon Burton Livingston ("Defendant") with Manufacturing of Marijuana, in

28 violation of Title 21, United States Code, Section 841(a)(1), and Possession of Marijuana with Intent



19                                                          04CR2254-WQH

to Distribute, in violation of Title 21, United States Code, Section 841(a)(1). The indictment also contains an allegation seeking forfeiture of the residence and property located at 17089 Lawson Valley Road in San Diego, CA. Defendant was arraigned on the indictment and entered a not guilty plea on August 26, 2004. A motion hearing is currently scheduled for November 5, 2004.

## II

## STATEMENT OF FACTS

### A.    Search of the U.S. Mail Parcel

On August 10, 2004, United States Postal Inspector Esteban Santana was conducting a routine inspection of inbound U.S. mail at the Midway Processing and Distribution Center in San Diego. During the inspection, Inspector Santana identified an Express Mail parcel addressed to Defendant Leon Livingston using an address which Inspector Santana recognized as belonging to a Commercial Mail Receiving Agency ("CMRA"). Inspector Santana knew, based on his training and experience, that CMRA's are sometimes used by individuals attempting to hide their true residence address from law enforcement. Inspector Santana also observed a phone number for the sender listed on the mailing label. Inspector Santana tried several times, unsuccessfully, to contact the sender of the package at the phone number listed on the label.

That same day, a narcotic detector dog examined the exterior of the package and alerted to the presence of narcotics or narcotics residue inside. Subsequent to the dog alert, Inspector Santana conducted a criminal history search for Defendant. The search revealed a 1990 arrest and conviction in San Diego for Unlawful Use of a Communication Facility–Marijuana. Defendant was sentenced to 30 months in prison. Inspector Santana also conducted a computerized criminal history search for the sender of the package, Mark D. McPherson of Olathe, Kansas. The search revealed multiple marijuana trafficking arrests and convictions.[1]

Based on his observations and the results of his investigation, Inspector Santana sought and obtained a search warrant for the parcel. The warrant was signed by U.S. Magistrate Judge Nita L.

---

[1] Agents would later learn that McPherson was arrested and convicted of possession with intent to distribute (marijuana) back in 1990 – part of the same offense for which Livingston was also convicted.

1  Stormes on August 10, 2004; a copy of the application, affidavit and warrant are attached hereto as

2  Exhibit A. The warrant was executed by service of a copy of the warrant upon the person from whom

3  the property was to be taken, here, the United States Postal Service. Upon opening the package, agents

4  discovered $30,000 in U.S. currency inside a "PC World" magazine.

5      **B.**    **Search of Residence at 17089 Lawson Valley Road**

6        On August 11, 2004, agents from the Drug Enforcement Administration ("DEA") learned of the

7  $30,000 found in the parcel sent from McPherson to Livingston. The DEA had been investigating

8  Defendant since 1989 and was the agency responsible for Defendant's 1990 arrest. That arrest stemmed

9  from a reverse "sting" operation in which the DEA negotiated the delivery of 1,200 pounds of marijuana

10  to Livingston; McPherson – the sender of the parcel in the present case – was arrested with Livingston

11  in 1990. DEA records revealed that over $300,000 in U.S. currency and four (4) firearms were seized

12  from Livingston at that time.

13        DEA investigators also spoke to a San Diego Narcotic Task Force Agent who disclosed that he

14  received a tip in 2002 that Livingston had an indoor marijuana garden at his address on Lawson Valley

15  Road in Jamul, California. The source revealed that Livingston had constructed a secret underground

16  room in which the marijuana could be grown without emitting a heat signature. The source also revealed

17  that the room was accessible through a false floor hidden by a filing cabinet located in one of the

18  property's outbuildings.

19        On August 12, 2004, DEA Agent M. Eschimi submitted an affidavit for search warrant to a San

20  Diego Superior Court Judge. In the affidavit, Agent Eschimi concluded that given the totality of the

21  circumstances, there was a fair probability that the evidence sought in the search warrant application

22  would be found on the property and in the structures located at 17089 Lawson Valley Road in Jamul,

23  California. The warrant was signed the same day by San Diego Superior Court Judge Michael D.

24  Wellington. A copy of the application and warrant is attached as Exhibit B.

25        On August 13, 2004, at approximately 10:05 a.m., Postal Inspector Santana contacted McPherson

26  by telephone and told him that he was having trouble locating Livingston's address for delivery of the

27  parcel. Santana asked McPherson to contact Livingston and have him come down to the post office and

28  pick-up the parcel. A few minutes later, Defendant called Santana and advised that he was 10 minutes

1   away from the post office.

2       Defendant arrived at the post office at approximately 10:30 a.m. and was met by Inspector

3   Santana and agents of the DEA. Defendant was informed of the package containing $30,000 and asked

4   for consent to search Defendant's residence. Defendant declined, at which point he was informed of the

5   search warrant and shown a copy, which Agent Eschimi was holding in his hands. Defendant was then

6   asked if he would be willing to accompany the agents to his residence, which he agreed to do. Defendant

7   was also asked if he would be willing to ride in one of the investigators' vehicles, to which he also

8   agreed. Defendant was not handcuffed. Defendant told investigators that his girlfriend, Darla Jordan,

9   was at his residence and that he had dogs. Based on this information, agents involved in the search met

10  in a school parking lot located between the post office and Defendant's residence where this new

11  information was disseminated. After approximately 10 minutes, agents continued to Defendant's

12  residence.

13      Agents arrived at Defendant's residence at approximately 11:15 a.m. and were met by Darla

14  Jordan. Jordan, a resident on the property and Defendant's girlfriend, exited the house and made contact

15  with DEA Agent M. Wells. Agent Wells informed Jordan of the warrant while other agents immediately

16  established a perimeter and began to secure the residence, multiple out-buildings, and the multi-acre

17  property for officer safety. Given Defendant's criminal history, the 1990 seizure of multiple firearms

18  from Defendant, and the size and complexity of the property to be searched, this was of paramount

19  concern. Once the property was secure, Defendant was shown a copy of the search warrant.

20      While securing the property, agents discovered a locked shed approximately 40 yards to the rear

21  of the main residence. Once officers gained entry, they located a large metal cabinet labeled "hazardous

22  material," also locked. The lock was cut and a false floor was found inside the cabinet. Removal of the

23  false floor revealed cement steps, leading down to two large, buried cargo containers, situated end-to-

24  end. Inside the containers, agents discovered a marijuana garden consisting of 224 marijuana plants.

25  Agents also found equipment, lights and chemicals used to grow marijuana indoors. Agents determined

26  that the lights, fans and other electrical equipment located in the cargo containers were powered with

27  stolen electricity; an SDG&E investigator later located the illegal attachments to the transmission lines

28  that provided the buried cargo containers with un-metered power.

04CR2254-WQH

1    Defendant was placed under arrest immediately following discovery of the marijuana garden.

2    A copy of the search warrant was then placed on the counter in the house–the same room in which

3    Defendant was located; Defendant was informed that the copy was his. At the conclusion of the search,

4    a receipt for the property seized was completed and left at the residence with the warrant.

5        **C.    Defendant's Arrest and Post-Miranda Statements**

6        Upon being placed under arrest, Defendant was informed of his constitutional rights per <u>Miranda</u>.

7    Defendant waived those rights and elected to speak with investigators.  Defendant initially denied

8    knowledge of the marijuana garden on his property, claiming that he rented the storage shed to Dave

9    Osborne for $200 per month.  Later in the interview, however, Defendant admitted knowledge of the

10   marijuana garden and that he maintained the garden with assistance from Osborne.  Livingston said that

11   the entire operation cost $35,000 to build and maintain.  Defendant claimed that the marijuana

12   discovered during execution of the search warrant was his first successful crop.

13        **III**

14   **EVIDENCE OBTAINED FROM THE PARCEL SEARCH AND SEARCH OF**

15   **DEFENDANT'S PROPERTY SHOULD NOT BE SUPPRESSED**

16       Defendant seeks suppression of all evidence stemming from the parcel search and the search of

17   his residence and property, claiming that he was not properly presented with copies of the warrants

18   pursuant to Rule 41.  Defendant is wrong–both in his description of the facts and his legal analysis.

19       **A.    Defendant Lacks Standing to Challenge the Sufficiency of Service of the Parcel**
             **Warrant**

20       It is undisputed that the parcel searched pursuant to the federal warrant was not in the

21   Defendant's possession or on his premises when Inspector Esteban obtained and executed the warrant.

22   As such, Defendant does not have standing to challenge Inspector Esteban's compliance with Rule 41:

23

24           Just as a person who is somewhere else cannot benefit from the
             "assurance" provided by the showing of a warrant, an absent person has
25           no present stake in the contemporaneous opportunity to monitor the
             search for compliance with the warrant. Thus the interest in the "notice"
26           that showing a warrant provides, likewise, does not run to someone who
             is not there and who cannot exercise that option.
27

28   <u>United States v. Silva</u>, 247 F.3d 1051, 1059 (9th Cir. 2001).  Defendant's motion to suppress the contents

     of the parcel should be denied based on his lack of standing alone.

                                        5                           04CR2254-WQH

1    Even setting aside Defendant's lack of standing, Inspector Esteban complied with the

2  requirement that he "give a copy of the warrant and a receipt for the property taken to the person from

3  whom, or from whose premises, the property was taken . . . ."  Id.  As the return on the warrant states,

4  a copy of the warrant was served on the United States Postal Inspection Service or "USPIS".  (See

5  Exhibit A.)  Obviously, this is the person and premises from which the property was taken and,

6  accordingly, Inspector Esteban complied with the requirements of Rule 41.

7    **B.**    **Service of the Search Warrant for Defendant's Residence was in Compliance with Rule 41**

8

9    Relying primarily on United States v. Gantt, 194 F.3d 987 (9th Cir. 1999), Defendant complains

10  that he was neither permitted to read, nor was he given a copy of, the warrant authorizing the search of

11  his property located at 17089 Lawson Valley Road.  As a result, Defendant argues, the evidence derived

12  from that search should be suppressed.  But in fact, a copy of the warrant was provided for Defendant.

13  Moreover, even if there was a technical violation of Rule 41, it was not the result of any "deliberate

14  disregard of the rule", nor did it result in any prejudice to the Defendant.  Defendant's motion should

15  be denied.

16    **1. Defendant was provided access to the search warrant**

17    The primary purposes for the service requirement contained in Rule 41(e) – formerly Rule 41(d)

18  – are to "provide the property owner assurance and notice during the search" and "to give notice to the

19  person subject to the search what the officers are entitled to seize."  See United States v. Gantt, 194 F.3d

20  987, 994-95 (9Th Cir. 1999).  Defendant was first informed of the existence of a search warrant while

21  he was at the post office, before the search of his property began.  While still at the post office, Agent

22  Eschimi showed him a copy of the search warrant face page.  This page includes the address of the

23  property to be searched, as well as a description of the scope of the search authorized by the warrant.

24  The page also declares that "substantial probable cause" existed to support the issuance of the warrant.

25  See Exh. B.  This is precisely the information Rule 41(e) intended government agents to convey:

26          [I]f the face sheet and attachments clearly state that the agents have
           lawful authority to conduct the search and specify the location to be

27          searched and the items sought, the affidavit supporting the probable cause
           determination need not be served at the time of the search.

28
     United States v. Celestine, 324 F.3d 1095, 1101 (9th Cir. 2003).

After agents secured Defendant's multi-acre property, Defendant was informed that a copy of the warrant had been placed on the counter in the room in which Defendant and his girlfriend, Darla Jordan, were located. In contrast to the defendant in <u>Gantt</u>, neither Defendant nor Ms. Jordan asked to handle, peruse or otherwise review the warrant – but it was right there, on the counter and available for inspection. Cf. <u>Gantt</u>, 194 F.3d at 990 (noting that the defendant was not provided a copy of the warrant until "hours after she requested to see the warrant" and after she had been arrested and taken to the FBI office).[2]

### 2. Any failure to comply with Rule 41(e) was not the result of "deliberate disregard" and did not result in prejudice to the Defendant

Assuming, *arguendo*, that agents did not comply with the technical requirements of Rule 41(e), suppression is not the appropriate remedy. As the Ninth Circuit stated in <u>Gantt</u>, "[v]iolations of Rule 41(d) do not usually demand suppression, however." It is only when the violation is the result of a "deliberate disregard" of Rule 41 or where the violation results in prejudice to the defendant that suppression *may* be appropriate. See <u>United States v. Johns</u>, 948 F.2d 599, 603-04 (9th Cir. 1991) (evidence not suppressed even when the failure to provide defendants with notice of the search resulted in some prejudice to the defendant). In <u>Gantt</u>, for example, the Ninth Circuit held that the agents deliberately disregarded the Rule when they failed to show the warrant to the defendant *"even after she asked to see it."* Id. at 994-95. Obviously, this kind of behavior is far removed from what happened here.

Once Defendant's multi-acre property had been secured for officer safety, Defendant was informed, together with his girlfriend, that a copy of the warrant had been placed on the counter in the room in which they were both located  – hardly the work of government agents bent on concealing the search warrant from Defendant. And this is certainly not a case where Defendant was denied access to the document after asking to see it. See, e.g. id. Nor is it a case where "agents would not have carried

---

[2] Notably, the <u>Gantt</u> decision is the only case cited by the Defendant which addresses Rule 41(e). But that case involves the deliberate withholding of the warrant from the defendant after it was requested. The balance of the cases cited in Defendant's brief involve either the fruits of warrantless searches or other, unrelated challenges – which, incidently, were all denied.

1 out the search and seizure had they been required to follow [Rule 41(d)] . . . ." United States v. Motz,

2 936 F.2d 1021, 1025 (9th Cir. 1991).  At bottom, Defendant was "not prejudiced by the agents' failure

3 to perform the ministerial requirements of Rule 41(d)", nor did they "intentionally and deliberately

4 disregard a provision in the Rule."  Id. (internal quotations omitted).  The evidence seized from

5 Defendant's property should not be suppressed.

6 **IV**

7 **DEFENDANT'S STATEMENTS SHOULD NOT BE SUPPRESSED**

8 Defendant's motion to suppress *all* of his statements rests on the flawed premise that he was

9 arrested when he was met by agents at the post office.  Not so.  Defendant was not arrested until after

10 discovery of the marijuana garden on his property, at which time he was informed of, and voluntarily

11 waived, his Miranda rights.  Defendant does not here challenge the voluntariness of his post-Miranda

12 statements.

13 **A.    Defendant was not Arrested at the Post Office**

14 After agents obtained a search warrant for Defendant's home, Inspector Esteban called

15 McPherson and asked him to have the Defendant come down to the post office to pick up the parcel.

16 The purpose in speaking with Defendant at the post office prior to executing the warrant was not to place

17 Defendant under arrest, but to inform him of the warrant and ascertain, for officer safety purposes, the

18 number of people located on the property and the presence of any weapons, dogs, etc.  After Defendant

19 was informed of the warrant, he was asked if he would be willing to accompany the agents to the

20 property and, if so, would he ride in a patrol car.  Defendant consented.  He was never placed under

21 arrest.  He was not handcuffed – not until after the marijuana garden was discovered on his property.

22 Defendant's brief detention at the post office was, at most, an investigatory detention that was

23 supported by ample "reasonable suspicion" that Defendant had committed a crime.  See Terry v. Ohio,

24 392 U.S. 1 (1968).  Indeed, as described below, a Superior Court judge had already found probable cause

25 to believe there to be evidence of narcotics violations on Defendant's property.  Defendant's detention

26 at the post office lasted no more than a few minutes.  He subsequently agreed to ride with the agents to

27 his residence; Defendant was free not to travel with the agents and he was not placed in handcuffs These

28 circumstances simply cannot constitute an "arrest".  See United States v. Taylor, 716 F.2d 701, 708-09

1   (9th Cir. 1983) (no arrest when suspect stopped at gunpoint, ordered to lie face down in a ditch,

2   handcuffed, and frisked);

3        Assuming, *arguendo*, that Defendant was placed under arrest at the post office, it would not have

4   been without probable cause.  What Defendant refers to as evidence supporting only a "suspicion" of

5   wrongdoing, a Superior Court judge found to be *probable cause* to search Defendant's residence for

6   evidence of narcotics violations.[3]  The undisputed facts supporting the probable cause to search

7   Defendant's property apply with equal force to establish the probable cause that would have been

8   necessary to place the Defendant under arrest at the post office.

9   **V**

10  **CONCLUSION**

11       For the foregoing reasons, the Government respectfully requests that this Court deny Defendant's

12  motions to suppress the seized evidence and Defendant's statements.

13

14  DATED:     October 29, 2004          Respectfully submitted,

15                        CAROL C. LAM

16                        United States Attorney

17

18                        STEPHEN R. COOK

19                        Assistant United States Attorney

20                        Attorneys for Plaintiff

21                        United States of America

22

23

24

25

26

27

28

---

[3] Defendant is not challenging the existence of probable cause supporting either search warrant.

# EXHIBIT A



AO 106 (Rev. 5/85) Affidavit for Search Warrant

# United States District Court

04 AUG 10 PM 3:29

Southern **DISTRICT OF** California

### In the Matter of the Search of
(Name, address or brief description of person or property to be searched)
Express Mail aricle ER668267958US addressed to
Leon Livingston, #502-150, 2514 Jamacha, El
Cajon, CA 92019, 619-445-2422.

BY:                    DEPUTY

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

**CASE NUMBER:**

'04 mg 1( ' '5

I, Esteban Santana _____ being duly sworn depose and say:

I am a(n) U. S. Postal Inspector _____ and have reason to believe
Official Title

that ☐ on the person of or ☒ on the premises known as (name, description and/or location)
The above described Express Mail article, which is in the custody of the U. S. Postal Inspection
Service, 815 E. Street, San Diego, CA.

in the Southern _____ District of California _____

there is now concealed a certain person or property, namely (describe the person or property)
Controlled substances, materials, and documents reflecting the distribution of controlled substances
through the United States Mail, including money paid for controlled substances, in violation of Title
21, United States Code, Sections 841(a)(1), 843(b) and 846

which is (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)
evidence and contraband

in violation of Title 21 _____ United States Code, Section(s) 841(a)(1), 843(b) and 846
The facts to support the issuance of a Search Warrant are as follows:
See Attached Affidavit of Postal Inspector Santana.

Continued on the attached sheet and made a part hereof.      ☒ Yes   ☐ No

Signature of Affiant

Sworn to before me, and subscribed in my presence

8-10-04 _____
Date

NITA L. STORMES
Name and Title of Judicial Officer  **U.S. MAGISTRATE JUDGE**

at San Diego CA _____
City and State

Signature of Judicial Officer



<u>AFFIDAVIT FOR SEARCH WARRANT</u>

I, Esteban Santana, being duly sworn hereby depose and state:

1.      I am a United States Postal Inspector assigned to the San Diego Field Office of

the Postal Inspection Service.  My duties include investigating Postal Offenses

and violations of the Drug Abuse Prevention and Control Act.

2.      This affidavit is submitted in support of an application for a search warrant for

the following:

Express Mail article ER668267958US addressed to Leon Livingston, #502-150,

2514 Jamacha, El Cajon, CA 92019, 619-445-2422 with a return address of Mark

McPherson, 32900 W. 135th, Olathe, KS 66061, 913-884-2110.  The weight of

the article is approximately 1 lb, 10.8 ozs.

3.      I have been employed as a Postal Inspector since March 2001.  Prior to that, I

was employed as an Investigator with the Cook County Office of the Inspector

General for three years.  I received basic training for approximately 14 weeks

from the U.S. Postal Inspection Service regarding individuals using the U.S. Mail

to transport controlled substances and proceeds from the sale of controlled

substances as well as the use of Postal Money Orders to launder the proceeds of

controlled substances.

4.      I received formal training for one week in June 2002 when I attended the

U.S. Postal Inspection Service Narcotics training course held in Philadelphia, PA.

This training involved narcotic investigation techniques, chemical field testing,

and training in the identification and detection of controlled substances and

narcotic proceeds being transported in the U.S. Mail and other commercial

carriers.  In August 2002, I received training for one week from the National

Drug Intelligence Center in Los Alamitos, CA. This training involved narcotic intelligence analysis which consisted of drug trafficking and smuggling techniques, drugs of abuse, drug trends and money laundering. In November 2002, I received training for three days from the California Narcotic Officers' Association in Anaheim, CA. This training involved investigations of drug usage such as Ecstasy, Ketamine, GHB and LSD; major drug trafficking investigations and undercover operations and tactics in narcotics investigations. In April 2003, I received formal training for four days in San Francisco, CA from the U.S. Postal Inspections Service. This training involved advance money laundering investigations which consisted of the history of money laundering and the U.S. Postal Inspection Service, the Bank Secrecy Act, case development, money order analysis, Patriot Act and investigative techniques.

5.     I have been involved in over 150 investigations involving the shipment of illegal narcotics and controlled pharmaceuticals as well as drug proceeds through the U.S. Mail. I have also investigated individuals who have used U.S. Postal Money Orders, commercial money orders and other types of negotiable instruments to launder the proceeds of illegal narcotics and controlled pharmaceuticals. These investigations have resulted in the seizure of illegal narcotics, controlled pharmaceuticals and proceeds of illegal narcotics and controlled pharmaceuticals and arrests of individuals trafficking illegal narcotics and controlled pharmaceuticals.

6.     Based upon my training, experience, talking with other law enforcement agents and interviews of suspects, I know the following in summary:

a.  Individuals who regularly handle controlled substances leave the scent of controlled substances on the currency and other items they handle. Proceeds from these sales are often stored in close proximity to the controlled substances, thereby transferring the odor of the controlled substance to the monies and packaging materials.  Narcotic canines are trained to alert on the scents of controlled substances.

b.  The Postal Inspection Service and DEA Narcotic Task Force Commercial Interdiction Team have worked aggressively to limit the use of shipping companies and the U.S. Mail for the transportation of controlled substances through these companies.

c.  Ongoing investigations have disclosed that Priority/overnight and "two day" article deliveries have become a method of choice by drug dealers for the transportation of contraband or the proceeds of narcotic sales.

d.  It is also known that Southern California is a source region for controlled substances being mailed throughout the United States.  The proceeds from these narcotic transactions are then transported via the U.S. Mails and other communication facilities back to Southern California, the source of the controlled substances.

e.  Drug dealers prefer the U.S. Mail, (but will sometimes utilize commercial shipping companies), specifically "Express Mail" or "Priority Mail," for the narcotic or narcotic proceeds transportation for various reasons, some of which are listed below:

1.  Items sent via "Express Mail" or "Priority Mail" are considered to be first-class mail; therefore, cannot be examined without a Federal Search Warrant.

2.  "Express Mail" is usually requested to be delivered by the next day's mail.

3.  "Priority Mail" is usually requested to be delivered within two days of mailing.

4.  Dispatch times for "Express Mail" are specific and are controllable by the mailer/shipper.

5.  Any delay to the mail is an indication to the mailer the mail items have been possibly compromised by law enforcement agencies to obtain a search warrant.

6.  While it is not always the case that a delay of "Express Mail" or "Priority Mail" is for law enforcement purposes, those involved in illegal transactions have found that the odds are against delays in deliveries of "Express Mail" or "Priority Mail" by the United States Postal Service.

7.  "Express Mail" and "Priority Mail" may weigh up to 70 pounds and is desired for large volume shipments.

f.  Businesses are more likely to use Express Mail and Priority Mail than First Class Mail in the course of normal business and will often use an Express Mail Corporate Account Number for the billing of the articles.

g.    Criminals who are involved in trafficking of controlled substances and drug proceeds will often receive and/or mail multiple Express and/or Priority Mail articles within a short time period of each other.

h.    Criminals who are involved in trafficking of controlled substances and drug proceeds will often use multiple Post Office Boxes, Commercial Mail Receiving Agency and addresses in foreign countries to conceal their true identities and residence.

i.    I also know from prior experience and conversations with trained narcotic canine handlers that canines are not trained to alert to pharmaceutical drugs. Narcotic canines are trained mostly to alert to heroin, cocaine, marijuana and methamphetamines substances. These substances are not contained in most pharmaceutical drugs.

j.    I also know that drug orders containing currency, checks or money orders sometimes do not contain the presence of controlled substances because persons involved in shipping often utilize packing methods and sanitation procedures to conceal the odor of controlled substances.

k.    I also know from talking to U.S. Postal Service Supervisors and Employees responsible for handling the mail that Express Mail is insured up to $100 for lost and damages. Insurance for Priority Mail may be purchased at an additional fee. Customers are discouraged from sending U.S. currency via the mail and are encouraged to purchase negotiable instruments as a means to send currency by the U.S. Postal Service.

7.    The information contained in this affidavit is based upon information I have gained from my investigations, my personal observations, my training and

experiences as well as information related to me by other Postal Inspectors and law enforcement personnel. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

8.   On August 10, 2004, during a routine inspection of inbound U.S. Mail at the Midway Processing and Distribution Center (2535 Midway Dr. San Diego), I identified Express Mail article ER668267958US addressed to Leon Livingston, #502-150, 2514 Jamacha, El Cajon as a possible narcotic proceeds article. I recognized the address listed on the subject label for the recipient, 2514 Jamacha, #502-150, as a Commercial Mail Receiving Agency (CMRA). I also noticed a telephone number on the subject label for the sender, 913-884-2110. I attempted several times to contact the aforementioned telephone number in order to obtain further information regarding the subject article without any success. I did not attempt to contact the telephone number listed on the subject label for the recipient given that a 'knock and talk' or further investigation may be conducted. I know from prior investigations that individuals involved in criminal activities sometimes use CMRA's in order to hide their true residence from law enforcement.

9.   On the same day, I met with Detective Larry L. Gosnell at the Midway Processing and Distribution Center. Detective Gosnell and his trained narcotic detection canine, "Condor", conducted an individual exterior inspection of the subject Express Mail article ER668267958 my presence. When "Condor" examined the subject parcel, Detective Gosnell advised that "Condor" alerted by sitting next to

the subject parcel, indicating the parcel contained controlled substances or residue of controlled substances.

10. I have been advised of the qualifications of the dog handler, Detective Larry L. Gosnell and his narcotic detection dog as described in Attachment A, which is filed in conjunction herewith and incorporated by reference herein.

11. I have also learned the following in summary from talking with Detective Steve Sloan. Detective Sloan is a Dog Trainer for the San Diego Police Department Canine Training Section, certifying official for the California Narcotic Canine Association and a court recognized narcotic detection canine expert:

Because of the absorption of the odor of controlled substances, and the narcotics detection canine's inherently keen sense of smell, the narcotic detection canine will continue to alert on the container or item depending on the length of exposure to the controlled substances, the specific controlled substance and the ventilation of the item or container. The common belief is all currency in circulation is contaminated with narcotics. It has been Detective Sloan's experience that a properly trained narcotic detection canine will not alert to all currency. Detective Sloan said the most relevant factor regarding alerts on currency is the threshold amount of narcotic odors that is set in the training of the narcotics detection canine. In Detective Sloan's experience that canine training must include the establishment of a lower threshold of approximately one gram of a controlled substance or more to ensure the canine must also be "proofed" from numerous odors including currency on a regular basis to maintain consistency. These substances have also included food, plastic and wrap, tape controlled substance adulterants,

7

circulated and non-circulated U.S. currency.  Proofing is a method used in training to ensure the canine alerts only to odors for which it is trained to alert.

12.     On the same day, I conducted a limited computerized search using Auto Track Faces of the Nation for Leon Livingston, 2514 Jamacha, #502-150, El Cajon. Auto Track Faces of the Nation identified Livingston as Leon B. Livingston, date of birth 04/01/1945, social security number 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.

13.     On the same day, I conducted a limited computerized search via National Crime Information Center (NCIC) for Livingston using his date of birth and social security number.  NCIC indicated an arrest in San Diego on September 1990 for Unlawful Use of a Communication Facility-Marijuana.  Livingston was sentenced to 30 months and 3 years probation.

14.     On the same day, I conducted a limited computerized search using Auto Track Faces of the Nation for Mark McPherson, 32900 Wl. 135th, Olathe, KS.  Auto Track Faces of the Nation identified McPherson as Mark D. McPherson, date of birth 04/05/1950, social security number 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.

15.     On the same day, I conducted a limited computerized search via NCIC for McPherson using his date of birth and social security number.  NCIC indicated the following for McPherson:

    1.  1976:  Arrested.  St. Louis, MO.  Possession and Distribution of Cannabis. Dismissed;

    2. 1977: Arrested.  St. Louis, MO.  Smuggling Marijuana and Conspiracy to Import Schedule 1 Controlled Substances.  Sentenced: 10 years (U.S. Penitentiary);

8

3. 1990: Arrested. Possession of Controlled Substances with Intent to Distribute. Sentenced: 64 months and 4 years supervised release (Federal Correctional Institution);

4. 1998. Arrested. Probation Violation; Possession with Intent to Distribute Controlled Substance. Sentenced: 6 months (Federal Correctional Institution).

16. I secured the subject Express Mail article in my office (814 E. Street, San Diego) pending an application for a federal search warrant.

17. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe drugs, notes, drug orders and/or currency from the illegal sale and mailing of controlled substances are being concealed in Express Mail article ER668267958US and seek the issuance of a search warrant directing the search of the article as described above and the seizure of the article, currency, and/or materials and documents reflecting the distribution of controlled substances, all in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846.

Esteban Santana

Postal Inspector

Sworn to before me, and subscribed in my presence, on this

_10_ day of August , 2004.

U. S. Magistrate Judge

9

**ATTACHMENT A**
**For**
**Larry L. Gosnell and K-9 Condor**

Larry Gosnell is a detective for the San Diego Police Department and has been a police officer for over **32** years. Detective Gosnell is currently assigned to the San Diego Integrated Narcotic Task Force Airport Team at the San Diego International Airport as a narcotic detection canine handler. From December 15, 2001 to July 20, 2003 Detective Gosnell was assigned the San Diego Integrated Narcotic Task Force Commercial Interdiction Team, and the San Diego Police Departments Narcotics Section as a narcotic detection canine handler. Detective Gosnell has spent approximately 20 years in patrol related functions and 12 years in investigations. He received training on the recognition and use of narcotics in the police academy, San Diego Police Department Narcotic Street teams, Drug Enforcement Administration, U.S. Customs, and Bureau of Narcotic Enforcement. He is a member of the California Narcotics Officers Association, California Narcotic Canine Association, International Narcotic Interdiction Association, Southern California Outlaw Motorcycle Gang Investigators Association, and International Outlaw Motorcycle Gang Investigators Association. Detective Gosnell has worked in an undercover capacity for approximately 7 years purchasing various types of controlled substances. He has personally made in excess of 200 narcotic purchases and assisted fellow law enforcement officials in over 400 more. He has made or been involved in over 400 arrests for the possession of controlled substances, including marijuana. He has read training bulletins on pharmaceutical drugs and looked at photos in street form. Gosnell was assigned to the Narcotics section on January 8, 1999. During this time, he received instruction by senior Narcotic Detectives on the current trends in narcotic language and sales amounts of street narcotics. Gosnell has completed the 80 hour basic narcotic school given by the Drug

Enforcement Administration, has received over **326 hours** of formal narcotics related training, has extensive experience in controlled substance investigations particularly involving marijuana, methamphetamine heroin and cocaine, airport, train, bus, hotel, motel, parcel interdiction, controlled deliveries, visual courier characteristics and search and seizure laws.

During the course of Detective Gosnell duties, he has worked undercover as a cab driver, a handicapped person confined to a wheelchair, and a street narcotics user. His duties as an undercover narcotics detective include contacting possible drug dealers by phone, pager, cell phone, car, on foot or bicycle. Detective Gosnell has met dealers at locations that they have requested and also at locations that he has directed them to.

Prior to coming to the Narcotics Section, Detective Gosnell was a detective with the J.U.D.G.E. Unit for two and a half years. His duties were to monitor the activities of people who were on formal probation or parole with narcotic or weapons violations and the activities of outlaw motorcycle gangs. Gosnell planned, executed and assisted in over 1200 Fourth waiver probation and parole searches on targeted narcotics offenders. He made or was involved in the arrest of over 450 such offenders with over 200 for various drug and narcotic violations. Detective Gosnell was assigned as the case agent during the time he worked in the J.U.D.G.E. Unit. In this capacity, he worked directly with the probation officer assigned to the unit, who was also the unit's canine handler.

Detective Gosnell was involved in **hundreds** of parcel cases where he utilized surveillance techniques, profiles of persons and parcels and the narcotic detection canine. Additionally, his expertise in identifying these characteristics has been the probable cause for the issuance and execution of search warrants for parcels containing controlled substances. Detective Gosnell has observed several hundred parcels during the course of his duties. On

selected parcels, he observed certain characteristics that although not illegal, when taken in their totality led him to believe the parcel contained controlled substances. These included illegible or non-existent return addresses, misspelled street names, handwritten labels, taped in an unusual manner, strong masking odors emitting from the parcel and/or cash payment. Detective Gosnell was able to confirm his suspicion by utilizing a narcotic detection canine to alert and obtaining a search warrant. It has come to his attention during recent inspections of parcels containing controlled substances, discovered during routine audits by United Parcel Service security, that the smugglers are utilizing extreme measures to shield the odor of the controlled substance from the canine. Detective Gosnell has testified as an expert in the field of narcotics in both Municipal and Superior Court in the investigation of narcotic related crime and the identification of controlled substances as well as the possession of controlled substances for sale and personal use. He is familiar with the manner in which said substances are packaged, marketed and consumed. He has received formal training and field experience in the identification of all types of controlled substances, particularly those mentioned above, by sight and odor. Detective Gosnell has searched, seen, tested and impounded various drugs and narcotics. He has written  search warrants and assisted in the service on numerous others. He has dealt with informants, surveilled drug buys and assisted with the arrests.

Between May and October of 2001, Detective Gosnell attended narcotic canine training as an observer. In October 2001, he was assigned the responsibility of training and working with narcotics canine Condor, ID#1073. Prior to Condor being assigned to Detective Gosnell, he was certified and worked with canine Officer S. Ortega, ID#4085, for approximately 2 ½ years. Between October and December 2001, Condor and Detective Gosnell were trained in the area of narcotics detection by San Diego Police Detective Steve Sloan.

On December 14, 2001, after 67 hours of training in the detection of marijuana, heroin, methamphetamine and cocaine, "Condor" was certified as 100% proficient in the detection of same by California Narcotic Canine Association certifying official Steve Sloan.  On October 24, 2002, California Narcotic Canine Association certifying official, Jay Brock, recertified Condor as 100% proficient.  On July 12, 2003, California Narcotic Canine Association certifying official Tom Iverson, recertified Condor as 100% proficient.

On March 23, 2004 , California Narcotic Canine Association certifying official, Tom Iverson , recertified Condor as 100% proficient.

Condor's alert consists of physical and mental reactions, which include a heightened emotional state, and coming to a complete "sit" when his physical position allows.  Condor and Detective Gosnell have completed a total of 254 hours of training. Subsequent to their certification, Condor has alerted 245 times and 79 search warrants have been obtained on his alerts.

Condor and Detective Gosnell have been involved in training exercises where known controlled substances, containers, or paraphernalia were hidden.  Because of the absorption of the odor, and the narcotics detection dog's inherently keen sense of smell, the narcotic detection dog will continue to alert on the container or item depending on the length of exposure to the controlled substance, the specific controlled substance, and ventilation of the item or container. The common belief is all currency in circulation is contaminated with narcotics.  It has been Detective Gosnell's experience that a properly trained narcotic detection canine will not alert to all currency.   Detective Sloan told Gosnell of numerous searches of parcels by trained narcotic detection canines where no alert was given.   The parcels later were discovered to contain substantial sums of U.S. currency.  It is Detective Gosnell's experience that the training

4

of the canine regarding threshold amounts of narcotic odors is the most relevant factor regarding alerts on currency. It has been his experience that the training must include the establishment of a lower threshold of approximately one gram of odor or more to ensure the canine is alerting to more than average contamination. Average contamination is reported to occur through normal handling.   The canine must also be "proofed" from numerous odors including currency on a regular basis to maintain consistency.   These have included food, plastic bags and wrap, tape, controlled substance adulterants, circulated U.S. currency, and other items.   Proofing is a method used in training to ensure the canine alerts only to the odors for which it is trained to alert.

# EXHIBIT B

1  SUPERIOR COURT OF THE STATE OF CALIFORNIA

2  FOR THE COUNTY OF SAN DIEGO

3

4  S E A R C H   W A R R A N T

5  No. 30701

6

7  The people of the State of California, to any sheriff,

8  marshal, police officer, or any other peace officer in the County

9  of San Diego:

10  Proof, by affidavit, having been this day made before me by

11  Michael Eschimi, a Special Agent employed by the U.S. Drug

12  Enforcement Administration, that there is substantial probable

13  cause for the issuance of the search warrant, as set forth in the

14  affidavit attached hereto and made a part hereof as is fully set

15  forth herein, you are, therefore, commanded to make search at any

16  time of the day, good cause being shown therefor, of the premises

17  and all parts therein, including all rooms, attics, basements,

18  cellars, crawl spaces, safes, mail receptacles, storage areas,

19  containers, surrounding grounds, trash areas, garages and

20  outbuildings assigned to or part of the residences located at:

21  17089 Lawson Valley Road, Community of Jamul, County of San Diego;

22  the residence is further described as being a single-story family

23  residence, tan in color with a tan roof and blue trim and the

24  number "17091" on a wood sign in the driveway; and any vehicle

25  parked at or near the above-described locations provided it can be

26  connected to an occupant of the premises by way of admissions,

27

28

1  keys, photographs, Department of Motor Vehicles documents,

2  insurance papers, or repair receipts; for the following property,

3  to wit: controlled substances, including marijuana, including bulk

4  marijuana, marijuana cigarettes, marijuana plants, seeds and

5  derivatives of marijuana, items used in the use, cultivation, sale

6  and transfer of marijuana, including pipes, hoses, buckets, water

7  metering devices, fertilizer, artificial soil such as Grodan, lava

8  rock, high intensity grow lights, timing chains, fans, cylinders

9  containing carbon dioxide, nursery pots and trays, electric timers,

10  scales, plastic baggies, cigarette papers, pipes and bongs;

11  evidence of the transfer and sales of controlled substances

12  including scales and other weighing devices, articles of personal

13  property tending to establish and document sales of the above

14  described substance including U.S. currency, computer hardware and

15  software, telephonic facsimile (fax) machines, fax receipts, buyer

16  lists, seller lists, sales records, address and telephone lists,

17  other documentation reflecting the receipt or sales of controlled

18  substance; firearms and ammunition; items evidencing the obtaining,

19  secreting, transfer, and/or concealment, and/or expenditure of

20  money, and/or related to the transportation, ordering, purchase and

21  distribution of marijuana; proceeds from the sales and transfer of

22  marijuana including United States currency, gold, precious metals,

23  jewelry, works of art, precious collectible items such as stamps,

24  trading cards, coins, celebrity autographs, and financial

25  instruments including stocks and bonds which are the fruits,

26  instrumentality's and/or evidence of controlled substance

27

28

1 trafficking; and papers, documents and effects tending to show

2 dominion and control over said premises, including keys,

3 fingerprints, clothing, prescription bottles, delivered mail,

4 photographs, photographic negatives, undeveloped film, homemade

5 videotapes, handwritings, documents and effects bearing a form of

6 identification such as a person's name, photograph, Social Security

7 number or driver's license number; and to answer incoming phone

8 calls, both landline and cellular, during execution of the warrant,

9 to view any video tapes seized pursuant to the warrant, and to open

10 or download and forensically examine all computer software and

11 programs seized pursuant to the warrant: and if you find the same,

12 or any part thereof, to bring it forthwith before me at the

13 Superior Court for the County of San Diego, or to any other court

14 in which the offense in respect to which the property is triable,

15 or retain such property in your custody, subject to the order of

16 this Court, pursuant to Section 1536 of the Penal Code.

17     Given under my hand and dated this 12th day of August, 2004.

18

19

20     Judge of the Superior Court
       County of San Diego

21

22

23

24

25

26

27

28

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN DIEGO

COUNTY OF SAN DIEGO }
                     }ss.
STATE OF CALIFORNIA }

**RECEIPT AND INVENTORY**

WARRANT NO. 30707

CASE NO. _____

_____
(name)

Receipt is hereby acknowledged, and the undersigned makes this inventory, of the following property and things seized by him/her this day in the search of the premises described in said warrant and taken pursuant thereto, to wit:

BOX FAN

2 LIGHT SHIELDS

2 TEMP GAUGES

3 FAN

4 THERMOMETERS

5 GROW BULBS

BALLAST

MISC DOCS FROM HOUSE

2 FLOOR FANS

BALLAST

LIGHT SHIELD

FOOD SEALER

SCALE

PACKAGING

LAMP

DATE: _____  TIME: _____

SIGNED: _____

DEPT./AGENCY: _____

ID NO.: _____

I, _____, the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all property taken by me on the warrant.

Subscribed and sworn to before me

this _____ day of _____   _____
                                                 Officer Executing Search Warrant

                                             _____
                                                 Magistrate/Judge

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN DIEGO

STATE OF CALIFORNIA)
              (ss.
COUNTY OF SAN DIEGO)

AFFIDAVIT FOR SEARCH
WARRANT
NO. 30701

I, Michael Eschimi, do on oath make complaint, say and

depose the following on this 12th day of August, 2004: that I

have substantial probable cause to believe and I do believe I

have cause to search the premises and all parts therein,

including all rooms, attics, basements, cellars, crawl spaces,

safes, mail receptacles, storage areas, containers, surrounding

grounds, trash areas, garages and outbuildings assigned to or

part of the residences located at 17089 Lawson Valley Road,

Community of Jamul, County of San Diego; the residence is further

described as being a single-story family residence, tan in color

with a tan roof and blue trim and the number "17091" on a wood

sign in the driveway; and any vehicle parked at or near the

above-described locations provided it can be connected to an

occupant of the premises by way of admissions, keys, photographs,

Department of Motor Vehicles documents, insurance papers, or

repair receipts; for the following property, to wit: controlled

substances, including marijuana, including bulk marijuana,

marijuana cigarettes, marijuana plants, seeds and derivatives of

marijuana, items used in the use, cultivation, sale and transfer

of marijuana, including pipes, hoses, buckets, water metering

1

devices, fertilizer, artificial soil such as Grodan, lava rock, high intensity grow lights, timing chains, fans, cylinders containing carbon dioxide, nursery pots and trays, electric timers, scales, plastic baggies, cigarette papers, pipes and bongs; evidence of the transfer and sales of controlled substances including scales and other weighing devices, articles of personal property tending to establish and document sales of the above described substance including U.S. currency, computer hardware and software, telephonic facsimile (fax) machines, fax receipts, buyer lists, seller lists, sales records, address and telephone lists, other documentation reflecting the receipt or sales of controlled substance; firearms and ammunition; items evidencing the obtaining, secreting, transfer, and/or concealment, and/or expenditure of money, and/or related to the transportation, ordering, purchase and distribution of marijuana; proceeds from the sales and transfer of marijuana including United States currency, gold, precious metals, jewelry, works of art, precious collectible items such as stamps, trading cards, coins, celebrity autographs, and financial instruments including stocks and bonds which are the fruits, instrumentality's and/or evidence of controlled substance trafficking; and papers, documents and effects tending to show dominion and control over said premises, including keys, fingerprints, clothing, prescription bottles, delivered mail, photographs, photographic

2

negatives, undeveloped film, homemade videotapes, handwritings, documents and effects bearing a form of identification such as a person's name, photograph, Social Security number or driver's license number; and to answer incoming phone calls, both landline and cellular, during execution of the warrant, to view any video tapes seized pursuant to the warrant, and to open or download and forensically examine all computer software and programs seized pursuant to the warrant.

I am a Special Agent employed by the Drug Enforcement Administration (DEA) and have been so employed for over eight years. I am currently assigned to the DEA San Diego Field Division, San Ysidro Resident Office. During this time, I have investigated illicit controlled substance trafficking in San Diego and surrounding areas, Washington D.C. and surrounding areas and Tijuana, Mexico. I have had formal training and experience in controlled substance investigations and I am familiar with the manner in which controlled substances, including marijuana are manufactured, packaged, marketed and consumed. I have received training in the identification of all types of controlled substances by sight and odor, including marijuana. I have made numerous arrests for violations involving such substance. In the course of my employment, I have become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and techniques of

3

manufacturers and traffickers in marijuana as practiced locally. I know through my training and experience that indoor marijuana cultivation primarily requires the use of hydroponics equipment such as lava rock in lieu of traditional soil methods.      The term hydroponics refers to the cultivation of plants by placing the roots in liquid nutrient solutions rather than soil. To conduct this type of cultivation the following equipment is required: rockwool also known as Grodan (a fibrous material used as a growing medium and substituted for soil; high intensity lights; nutrients; fertilizers; various types of fans, tables, and trays that are specifically designed to facilitate the irrigation of plants; CO2 enrichment systems; electrical timers, and other items that allow for optimum growing conditions.

I am also aware indoor cultivators generally utilize a technique known as "cloning" to produce additional plants from clippings from a "mother plant".  These clipping are genetically identical to the mother plants.  This allows the cultivator to take cuttings from a female plant and ensure the cuttings will develop into identical female plants.  This type of cultivation produces a seedless marijuana plant known as "Sinsemilla", which has a very high street value and worthy of this expensive investment.  In addition, this allows for a normally an annual plant to be grown year round (three to four crops a year indoors).  The cloning process allows for the cultivator to

4

operate on an ongoing basis, capable of producing a very high quality marijuana throughout the year. This is further made possible by the utilization of indoor lighting, which by adjusting the light cycle, allows the cultivator to extend the growing cycle of "mother plants" indefinitely.

The most common method of growing marijuana indoors is by utilizing hydroponics, which refers to the growing of plants in nutrient solution, with or without an inert medium, to provide mechanical support. This growing medium is often referred to as Grodan or rockwool and is commercially available. Cultivators will take small cuttings, (known as clones) from large female marijuana plants and place them into small cubes of rockwool. These clones will be placed into various specially made tables or trays where water, containing all of the vital nutrients that soil normally contains, will saturate the clones. The water is stored in a reservoir and pumped into the trays containing the plants and automatically drains back into the reservoir.

The clones are then placed under high intensity lights ranging from 150 to 400 watts. The lights are generally placed on a timer for 18 hours in a 24-hour period to allow for the plants to acquire a vegetative growth. In approximately seven to ten days the clones will begin to form roots. As the plants continue to grow, a higher intensity light is required to obtain optimum light conditions. Cultivators will use 400-watt and up

5

to 1000-watt lights to provide the plants with enough light to grow as if they were outside.

These lights are often mounted on a mechanical track, which allows the lights to slowly move across the plants providing an equal amount of light to all of the plants. Cultivators have been known to mount a multitude of these lights into an enclosed room. This creates tremendous amounts of heat. In some cases, additional equipment is required such as oscillating fans to cool the room and to exercise the plants. $CO_2$ (carbon dioxide) systems are installed to create optimum air conditions for the plants. The $CO_2$ system allows for optimum plant development; and when properly installed, cultivators can achieve a significant productivity increase from their plants. Ultimately the cultivators are striving to produce colas, the flowering tops of the marijuana plants where the tetrahydrocannabinol (THC) is mostly concentrated.

In approximately 10 weeks the cultivator will program the lights to be on 12 hours a day, allowing for 12 hours of darkness. The plants are once again tricked into sensing a seasonal change and they will spend 70 percent of their energy into producing colas for the next production. Since the plants are never being exposed to male plants, they will not be pollinated and will not produce seeds (hence the term sinsemilla which means "without seeds"). The flowering tops of the

6

marijuana plants are known to cultivator as "buds" and are extremely potent in their THC content. The cultivation of indoor marijuana is a very unique process in that it allows for the cultivator to operate on an ongoing basis that yields a very high quality product.

On August 11, 2004, I learned that United States Postal Inspectors obtained and executed a federal search warrant following an alert by a trained narcotic detection dog on a suspicious package being sent through the mail to Leon Livingston in San Diego from Mark McPherson in Kansas. A search of the package revealed approximately $30,000 U.S. currency.

As a result of this information other agents and I began checking law enforcement data bases for information regarding Livingston and McPherson. We also checked with other police officials regarding historical information received about Livingston and McPherson.

Regarding Livingston, I learned he was arrested in San Diego in 1990 for the Unlawful Use of a Communication Facility-Marijuana. Livingston was sentenced to 30 months in jail and 3 years probation.

Further, I learned DEA has been investigating Livingston since 1989. Specifically, DEA arrested him in 1990 during a reverse "sting" operation in which DEA planned to deliver 1,200 pounds of marijuana. Records reveal that over $300,000 U.S. currency and four guns were seized from Livingston at that time.

On August 11, I spoke to Narcotic Task Force Agent Steve Reed who informed me that in 2002 he received a tip from a source of information that Livingston had an indoor marijuana garden at his address on Lawson Valley Road.  According to Reed, the source of information stated that Livingston created a secret underground room in which the marijuana is grown.  This room would prevent the existence of a heat signature detectable by law enforcement.  According to the source of information, the underground room is accessed through a false floor hidden by a filing cabinet in one of the property's outbuildings.

Regarding McPherson, I learned that he was arrested in 1976 in St. Louis Missouri for possession and distribution of marijuana.  He was arrested again in 1977 in St. Louis Missouri for smuggling marijuana and conspiracy to import marijuana.  He was sentenced to 10 years in prison.  In 1990 he was arrested again for possession of a controlled substance with intent to distribute.  For this he was sentenced to 64 months in prison and four years supervised released.  In 1998, he was arrested again for possession with intent to distribute a controlled substance and was sentence for violating his probation to six months in prison.

Further, I learned DEA has been investigating McPherson since 1976.  Specifically, he was implicated at that time in an international multi-ton marijuana trafficking organization. Also, McPherson has been linked to Livingston since 1990 and was

arrested in 1990 in San Diego for possession of marijuana with intent to distribute.  This case is the same one in which Livingston was arrested.

I know, under *Illinois v. Gates* (1983) 462 U.S. 213, the magistrate reviewing this affidavit must conclude whether, given the totality of the circumstances, there is a fair probability that the evidence sought will be located at the scene of the search.

Based on the following, I believe a fair probability of such a conclusion exists:

1.  The fact Livingston and McPherson have both a documented personal and criminal relationship since, at least, 1990.

2.  The fact Livingston and McPherson both have criminal records for trafficking in drugs.

3.  The fact a source of information told a police officer in 2002 that Livingston was cultivating marijuana in a secret, underground room on his property located at 17089 Lawson Valley Road.

4.  The fact that within the last seven days, McPherson mailed a package containing $30,000 U.S. currency to Livingston. I know normal, law-abiding citizens, who have no reason to hide their assets from the police, will use a check, money order, or wire transfer to move that amount of money.  On the other hand, I know, based on my training and experience, that drug traffickers commonly send large amounts of cash via the United States Postal

9

Service or commercial shippers, such as United Parcel Service, or Federal Express in payment for controlled substances shipped out of San Diego.

5.   The fact a trained narcotic detection dog alerted to the package indicating the presence of narcotic's residue.

Based on my training and experience, I believe that Livingston and McPherson have known each other in a both personal and criminal capacity since 1990.  I further believe that the $30,000 cash mailed by McPherson to Livingston was for drugs that Livingston had already sent, or plans to send, McPherson in Kansas.  Furthermore, I believe that Livingston is currently involved in selling drugs, and may be operating an indoor marijuana cultivation garden in an underground room on the aforementioned property.

Based on my training and experience, I know drug dealers will often keep all or various portions of their dope in their vehicles.  This is done for several reasons.

Given both the criminal nature of their business as well as their financial investment in inventory, drug dealers are always concerned about becoming compromised and losing their dope or the money derived from their drug sales to law enforcement authorities during a search.  Similarly, they are also afraid of being "ripped off" (becoming a theft victim) by rival dope dealers.  Consequently, dope dealers will often hide all or part of their "stash" (inventory) in one or more vehicles away from

10

their residence.  These vehicles include ones in the dealer's

possession, for example, taken in trade or collateral for drugs,

but not registered in the dealer's name.  I also know drug

dealers will often register cars they own in the names of others

in order to avoid loss of the vehicles through asset forfeiture

laws in the event they are investigated or arrested.

    I also know people engaged in the sale of contraband

frequently transact 'business' over their telephones, often using

'pagers' in order to maintain steady contact with customers and

suppliers.  Most commonly, buyers will call the premises in order

to confirm the presence of contraband and to place orders.

Answering such calls will tend to provide additional evidence of

the sale of controlled substances and will tend to identify the

seller of such contraband.  Callers requesting controlled

substances will frequently ask for the seller by name and come to

the premises following a ruse-invitation by an officer conducting

the search.  Callers to the premises who are calling for

legitimate innocent reasons will generally identify themselves to

police officers and provide an immediate witness who can be used

to establish the identity of those in control over the premises.

    Furthermore, my training and experience indicates persons

dealing in controlled substance trafficking frequently arm

themselves with firearms and ammunition and keep them available

either in their premises, in their vehicles or on their person.

This phenomenon is primarily due to the large amounts of cash or

11

valuable contraband involved in the drug trade and the fact that people so inclined tend to resort to violence to resist robbery, settle disputes or thwart capture by law enforcement. The California Supreme Court has stated, "it is common knowledge that drug dealers typically use firearms and ammunition in the course of their drug sale operations." (People v. Bland (1995) 10 Cal.4th 991, 1005). Also, presence of firearms, along with the other described evidence, will tend to circumstantially establish sales and provide a basis for alleging a violation of Penal Code section 12022(a).

Accordingly, presence of firearms, along with the other described evidence, will tend to circumstantially establish sales and provide a basis for alleging a violation of Penal Code section 12022(a).

Business records, as more fully described above, are frequently maintained by those engaged in the 'business' of manufacturing and selling controlled substances. Also, those so engaged will frequently maintain writings, books, business ledgers, lists, notations, and other memoranda to assist them in their criminal enterprises. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate business keep similar materials. I know drug dealers commonly adapt modern technology to further their criminal enterprises and will often maintain such records on computer hard drives or floppy disks. Likewise, personal

12

computers with modems allow users to communicate through phone or cable television lines via e-mail and the Internet. Such messages may be stored on computer disks or on the computers hard drive and would tend to show communications in furtherance of a conspiracy as well as those with buyers and larger dealers.

Based on the above investigation and my training and experience I believe the suspects herein are involved in the indoor cultivation of marijuana from the above described premises. Furthermore, my training and experience indicates persons in control of premises leave evidence of their identification such as fingerprints and handwritings, which are subject to expert identification, routinely in the normal course of living within their premises. Also, clothing, photographs, canceled mail and the like are routinely maintained in a person's premises as necessary and incident to maintaining such premises.

In addition, by answering phone calls at the premises while the search warrant is being executed, I expect to talk with persons who are familiar with the persons in control of the premises and will so testify. Such callers and described dominion and control evidence is vital to proving control over the described property to be seized. Also, persons involved in the manufacture, sale and purchase of controlled substances, often utilize telephones, telephone answering machines and paging devices for communication purposes between others involved in

13

this illicit enterprise. Persons attempting to arrange for the sale, purchase, transportation and manufacture of controlled substances frequently will contact their illegal business customers and associates to negotiate business deals. Incoming calls may be received during the execution of the warrant, and persons on the other end of the line will ask for various suspects or make orders for controlled substances. Such evidence will be probative as to the identity of the suspects involved, the issue of dominion and control, and the issue of whether any controlled substance located in the premises are possessed for sale, and whether a suspect is involved in the illegal trafficking or manufacture of controlled substances from the premises to be searched.

Like most modern businessmen, narcotics dealers also use telephonic facsimile (fax) machines to communicate with each other. Fax machines can work off a regular phone line as well as a dedicated hard line. Records of transmittals are often maintained in these machines which would tend to help identify co-conspirators, as well as the transmittal "receipts" produced by the fax machine after each message.

Therefore, based on my training, experience, and the above facts, which I believe to be true, I believe I have probable cause to believe the above-described property or a portion thereof will be at the described premises when the warrant is

14

served.

Based on the aforementioned information and investigation, I believe grounds for the issuance of a search warrant exist as set forth in Penal Code section 1524.

I, the affiant, hereby pray a search warrant be issued for the seizure of said property, or any part thereof, from said premises at any time of the day, good cause being shown therefor, and the same be brought before this magistrate or retained subject to the order of this Court.

This affidavit has been reviewed for legal sufficiency by Deputy District Attorney Marty Martins.

Given under my hand and dated this 12th day of August, 2004.

_____ 8/12/04
,Special Agent Michael Eschimi

Subscribed and sworn to before me
this 12th day of August, 2004,
at  5:15   a.m./p.m.

_____
Judge of the Superior Court
San Diego County

15

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Criminal Case No. 04CR2192-W |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| FERRER SANCHEZ-SERANO, | ) | |
| Defendant. | ) | |

IT IS HEREBY CERTIFIED that:

I, Stephen Cook, am a citizen of the United States over the age of 18 years and a resident of San Diego County, California; my business address is 880 Front Street, Room 6293 San Diego, California 92101-8800; I am not a party to the above-entitled action, a copy of the following was placed in the United States mail, postage prepaid:

**GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS**

to:

Eugene Iredale
105 West F Street, 4th Floor
San Diego, CA 92101

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 29, 2004

STEPHEN COOK